**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Stefan Bogdanovich (State Bar No. 324525)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
        sbogdanovich@bursor.com
        jwilner@bursor.com
        jglatt@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALVOID BENNETT and REGINE URCIA, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>TESTMAX, INC.,<br><br>                    Defendant. | Case No.   2:24-cv-3662<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiffs Alvoid Bennett and Regine Urcia ("Plaintiffs") bring this action on behalf of themselves, and all others similarly situated against TestMax, Inc. ("Defendant"). Plaintiffs make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    Defendant TestMax, Inc. is a test preparation company that offers prospective test-takers paid courses for certain standardized exams. One of the courses Defendant offers is called LSAT Max and is advertised as a way for subscribers to prepare for the Law School Admission Test ("LSAT"). LSAT Max is offered to consumers through Defendant's website, testmaxprep.com.

2.    Defendant has installed "tracking pixels" on its website, which hosts the test prep videos. These tracking pixels surreptitiously send consumers' viewing activities to third-party providers like Meta Platforms, Inc. ("Meta" or "Facebook") without consent, in violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C § 2710, *et seq.,* and California Civil Code § 1799.3.

3.    Congress has recognized that "films are the intellectual vitamins that fuel the growth of individual thought." S. Rep. No. 100-599, at *7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and Law, Hearing Tr. at 10 (Aug. 3, 1988)). As the Committee on the Judiciary explained when considering the VPPA, "[Privacy] is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom. We want to be left alone." *Id.* at *6. The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." *Id.* at *8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one

purpose may not be used for a different purpose without the individual's consent." *Id.*

4.      Specifically, Defendant violated the VPPA and California Civil Code § 1799.3 by knowingly disclosing personally identifiable information ("PII") and personal information ("PI") of Plaintiffs and the class members to Meta without their consent.  To do so, behind the scenes of its study aid videos, Defendant installed computer code on its website called the "Meta Tracking Pixel," which— unbeknownst to Plaintiffs and the members of the Classes—tracks and records Plaintiffs' and the Class Members' private video consumption and a record of the study aid videos they watched and discloses it to Meta without their consent.  Meta, in turn, uses Plaintiffs' and the Class Members' video consumption habits to build profiles on consumers and deliver targeted advertisements to them, among other activities.[1]

## PARTIES

5.      Plaintiff Alvoid Bennett is a California citizen who resides in Los Angeles, California.  Plaintiff Bennett signed up for an LSAT Max subscription and watched an LSAT Max test prep video on Defendant's site as recently as April 2024. Plaintiff Bennett accessed his LSAT Max account to watch these videos on the same browser he uses to access his Facebook account, which exists using his real name.

6.      Plaintiff Regine Urcia is a California citizen who resides in Chino Hills, California.  Plaintiff Urcia signed up for an LSAT Max subscription and watched LSAT Max test prep videos on Defendant's site as recently as October 2023. Plaintiff Urcia accessed her LSAT Max account to watch these videos on the same browser she uses to access her Facebook account, which exists using her real name.

---

[1] Notably, the Meta Tracking Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its digital subscribers' viewing information directly from its web server to Meta's web servers.  Additional copies of this information are communicated through the use of cookies.

7.    TestMax, Inc. is a Florida corporation with its principal place of business at 280 W. Canton Avenue, Suite 250, Winter Park, Florida 32789. Defendant owns and operates LSAT Max, an online LSAT preparation service that is used throughout California and the United States.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under a law of the United States (*i.e.,* the VPPA).  This Court also has supplemental jurisdiction over the California state law claim because it arises from the same transactions and occurrences which give rise to the action under federal law.  In addition, this Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the Class and California Subclass, and there is minimal diversity.

9.    This Court has personal jurisdiction over Defendant because Defendant conducts substantial business in this district and has purposefully directed its activities to this state and District by (1) conducting business within California, (2) selling, marketing, and advertising LSAT Max subscriptions, and (3) collecting and disclosing the personal information of LSAT Max consumers in this District.  As such, a substantial portion of the events giving rise to Plaintiffs' claims occurred in this District.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to these claims occurs in this District.  In addition, Plaintiffs reside in this District and watched Defendant's videos in this District.

## FACTUAL ALLEGATIONS

### A.    The VPPA

11.    The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the

confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper, which was then published.  With an eye toward the digital future, Congress responded by passing the VPPA.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, or who some of the people they telephone.  I think that is wrong.  I think that really is Big Brother and I think it is something that we have to guard against.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

12.     Accordingly, the VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

13.     As Senator Patrick Leahy explained, the VPPA was particularly concerned with consumers' video transactional data being shared with unauthorized third parties:

> The trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping

systems is a new, more subtle and pervasive form of surveillance.  These "information pools" create privacy interests that directly affect the ability of people to express their opinions, to join in association with others and to enjoy the freedom and independence that the Constitution was established to safeguard.  The bill prohibits video stores from disclosing "personally identifiable information"—information that links the customer or patron to particular materials or services.  In the event of an unauthorized disclosure, an individual may bring a civil action for damages.

S. Rep. 100-599, at 5-6 (internal ellipses omitted).

14.    The Senate Report for the bill further clarifies "that personally identifiable information is intended to be transaction oriented.  It is information that identifies a particular person as having engaged in a specific transaction with a video tape service provider."  S. Rep. 100-599, at 12.

**B.    California Civil Code § 1799.3.**

15.    Cal. Civ. Code § 179.3 provides a wider breadth of protection for consumers by requiring that:

No person providing video recording sales or rental services shall disclose any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual.

16.    Cal. Civ. Code § 1799.3 does not require that the information being disclosed by video recording sales or rental service providers be *identifiable* to any one particular person.  Rather, the statute forbids the disclosure of generalized "personal information" without that person's consent even if that information does not serve to identify them.

17.    The statute also forbids the mere disclosure of "the contents of any record, including sales or rental information," such as the mere title of the movie ticket purchased, or a video requested.

**C.    The Meta Tracking Pixel**

18.    Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[2]  Facebook describes itself as a "real identity platform,"[3] meaning users are allowed only one account and are encouraged to share "the name they go by in everyday life."[4]  To that end, when creating an account, users provide their first and last name, along with their birthday, gender and phone number or email address.[5]

19.    Meta owns Facebook.com and generates revenue by selling advertising space on its website, and other applications it owns, like Instagram.[6]

20.    Meta sells advertising space by highlighting its ability to target users.[7] Meta can target users effectively because it surveils user activity both on and ***off its site***.[8]  This allows Meta to make inferences about users beyond what they explicitly

---

[2] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO! (July 28, 2021), *available* https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html (last accessed Apr. 25, 2024).

[3] Sam Schechner & Jeff Horowitz, *How Many Users Does Facebook Have? The Company Struggles to Figure it Out*, Wall St. J. (Oct. 21, 2021) *available* https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701 (last accessed Apr. 25, 2024).

[4] META, *Community Standards, Part IV Integrity and Authenticity,* available https://www.facebook.com/communitystandards/integrity_authenticity (last accessed Apr. 25, 2024).

[5] META, *Sign Up*, available https://www.facebook.com/ (last accessed Apr. 25, 2024).

[6] Mike Isaac, *Facebook Profit Surges 101 Percent on Strong Ad Sales,* N.Y. TIMES (July 28, 2021) *available* https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html (last accessed Apr. 25, 2024).

[7] META, *Why Advertise on Facebook, Instagram and other Meta Technologies*, available https://www.facebook.com/business/help/205029060038706 (last accessed Apr. 25, 2024).

[8] META, *About Meta Pixel*, available https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last accessed Apr. 25, 2024).

disclose, like their "interests," "location," and "demographics."[9]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

21.    Businesses can also build "Custom Audiences."[11]  Custom audiences enable businesses to reach "people who already know [their] business," because Meta can track whether they're loyal customers or people who have used a particular business' app or visited website."[12]  Businesses can use Custom Audiences to target existing customers directly, or they can use it to build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behaviors from your source audience to find new people who share similar qualities."[13]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[14]  One such Business Tool is the Meta Tracking Pixel.

---

[9] META, *Ad Targeting Help Your Ads Find the People Who Will Love Your Business*, available https://www.facebook.com/business/ads/ad-targeting (last accessed Apr. 25, 2024).

[10] META, *Easier, More Effective Ways to Reach the Right People on Facebook*, available https://www.facebook.com/business/news/Core-Audiences (last accessed Apr. 25, 2024).

[11] META, *About Custom Audiences*, available https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last accessed Apr. 25, 2024).

[12] META, *About Events Custom Audience*, available https://www.facebook.com/business/help/366151833804507?id=300360584271273 (last accessed Apr. 25, 2024).

[13] META, *About Lookalike Audiences*, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last accessed Apr. 25, 2024).

[14] META, *Create a Customer List Custom Audience*, available https://www.facebook.com/business/help/170456843145568?id=2469097953376494 ; *See Also* Meta, *Create a Website Custom Audience*, available https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last accessed Apr. 25, 2024).

---

22.    The Meta Tracking Pixel is a piece of code that businesses, like Defendant, can integrate into its website.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[15]  When the Meta Tracking Pixel captures an action, it sends a record to Facebook. Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

23.    Businesses control what actions—or, as Meta calls it, "events"—the Meta Tracking Pixel will collect on that business's site, including the website's metadata, along with what pages a consumer views.[16]  Businesses can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu of "standard events" from which businesses can choose to track, including what content a consumer views or purchases.[17]  An advertiser can also create their own tracking parameters by building a "custom event."[18]

24.    Likewise, businesses using the pixel on their website control how the Meta Tracking Pixel identifies consumers.  The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[19]  The HTTP Headers collect "IP addresses, information about the web browser, page location,

---

[15] META, *Retargeting*, available https://www.facebook.com/business/goals/retargeting (last accessed Apr. 25, 2024).

[16] *See* META, *Meta Pixel, Accurate Event Tracking, Advanced*, available https://developers.facebook.com/docs/facebook-pixel/advanced/; *See also* Facebook, *Best Practices for Facebook Pixel Setup*, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last accessed Apr. 25, 2024).

[17] META, *Specifications for Meta Pixel Standard Events*, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last accessed Apr. 25, 2024).

[18] META, *About Standard and Custom Website Events*, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last accessed Apr. 25, 2024).

[19] META, *Meta Pixel*, https://developers.facebook.com/docs/facebook-pixel/ (last accessed Apr. 25, 2024).

document referrer and persons using the website."[20]  Pixel-specific Data includes

"the Pixel ID and Cookie."[21]

25.    The Meta Pixel, like website cookies generally, attaches to the browser

that the user uses to access their Facebook account.  That cookie then follows the

user's web activity occurring within that same browser.  For example, if the user

accesses Facebook.com through their Safari browser, then moves to Macys.com after

leaving Facebook, the Meta Pixel will continue to track that user's activity on that

browser.

**D.    Defendant Is A Video Tape Service Provider**

26.    Defendant owns and operates LSAT Max, an LSAT test preparation

service that offers future test-takers "1,000+ Hrs Video Training" to prepare to take

the LSAT.[22]  Users can either sign up for the paid Self-Study plan, Live + Tutoring

plan, or the On-Demand plan.  Students who subscribe to the Live + Tutoring and

On-Demand plans have access to video lectures "[t]aught by top instructors in

whiteboard video format with detailed diagrams."[23]  As Defendant prominently

advertises, the full course offers "1,500+ hrs of video" with "[p]roven strategies &

techniques guaranteed to raise your score."[24]

---

[20] *Id.*

[21] *Id.*

[22] LSAT Max, *Enroll Today*, available https://testmaxprep.com/lsat/enroll-today (last
accessed Apr. 26, 2024).

[23] *Id.*

[24] *Id.*



**Figure A**

27.     To further appeal to prospective students looking to improve their LSAT scores using Defendant's service, Defendant posts on its sales page some of the glowing Trust Pilot reviews written by previous consumers, including many that specifically references Defendant's video tutorials:



**Figure B**

28.    Once the consumer has subscribed, they have access to a host of videos, titled "lectures," that they can watch in a pre-planned study sequence.



**Figure C**

29.    In addition, the subscriber is given access to a study calendar created by Defendant, which is calibrated to get the consumer through the study course in time for their LSAT test day.  Video lessons are pre-planned for the consumer.  For example, a student preparing for the April 2024 LSAT exam, is given a study calendar starting in December, guiding them to April:



**Figure D**



**Figure E**

30.     Defendant's video lessons are a critical component of the study plans it sells to consumers.  As demonstrated, an April 2024 LSAT taker is directed to watch at least one of Defendant's video lessons on 28 days of the first two months, nearly half of the total study plan.

31.     Defendant's pre-recorded videos appear as recorded lectures for later review, with an instructor on the top right and slides in the center that are made accessible through the consumer's portal:



**Figure F**

Videos are also presented in the form of narrated topics, with animation and navigation:

1
2
3
4
5
6
7
8
9
10



11    **Figure G**

12    **E.    LSAT Max and Meta Pixel Disclosures**

13    32.    Unbeknownst to Defendant's consumers, LSAT Max knowingly

14  discloses users' video histories to Meta.

15    33.    LSAT Max's website hosts the Meta Tracking Pixel which transmits

16  events to Meta.  The first event is PageView.  The PageView discloses a webpage's

17  Universal Resource Locator ("URL") which contains data specific to identifying the

18  title of the video.  That information is also relayed to Meta as shown in figures H, I,

19  and J.

20    34.    When a user selects a video to watch, the URL populates with the

21  identifying information:

22
23
24
25
26
27
28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED    14

**Figure H**

35.     Each video has a unique and specific numerical ID corresponding to the
video and the study topic that video is nested under.  These numerical IDs, contained
in the video URL, readily permit any person with an Internet browser to identify the
specific video that a user requested or obtained.

36.     These identifying numerical strings are also disclosed to Meta, along
with the user's Facebook ID, which is located in the c_user cookie.

**Figure I**

37.    The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID.  A Facebook ID allows *anybody*—not just Facebook—to identify the individual LSAT Max student with a Facebook account.  If one types www.facebook.com/[facebookID] into a web browser, it will load the individual's Facebook page.

38.    The Meta Tracking Pixel transmits additional cookies to Meta.

39.    The fr cookie, active on Defendant's site, contains, at least, an encrypted Facebook ID and browser identifier.[25]  Facebook, at a minimum, uses the fr cookie to identify particular users.[26]

| Request Cookies | ☐ show filtered out request cookies | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Name ▲ | Value | Domain | Path | Expires ... | Size | HttpOnly | Secure | SameSite |
| c_user | 61556751966883 | .facebook.c... | / | 2025-0... | 20 | | ✓ | None |
| datr | OGbfZdjttCdqBlPCApMhwKqL | .facebook.c... | / | 2025-0... | 28 | ✓ | ✓ | None |
| fr | 1dLoTpr7pFfQd8dHb.AWWLpx_ZWM7SlXu_1GtxS... | .facebook.c... | / | 2024-0... | 82 | ✓ | ✓ | None |
| ps_n | 1 | .facebook.c... | / | 2025-0... | 5 | ✓ | ✓ | None |
| sb | ma5vZcdDROgcVHxUJqJLqHWH | .facebook.c... | / | 2025-0... | 26 | ✓ | ✓ | None |
| xs | 39%3AhoygqNCcDoY9iA%3A2%3A1709833472%3... | .facebook.c... | / | 2025-0... | 96 | ✓ | ✓ | None |

**Figure J**

40.    Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  Facebook uses this for targeted advertising.

41.    The Meta Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.* testmaxprep.com.[27]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.,* Facebook.[28]

42.    Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

43.    Through the Meta Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, what LSAT Max students are requesting and watching for their studies.

---

[25] DATA PROTECTION COMMISSIONER, Facebook Ireland Ltd, Report of Re-Audit (Sept. 21, 2012), *available* http://www.europe-v-facebook.org/ODPC_Review.pdf

[26] META, Cookies & Other Storage Technologies, https://www.facebook.com/policy/cookies/ (last accessed Apr. 29, 2024).

[27] PC MAG, *First Party Cookie*, available https://www.pcmag.com/encyclopedia/term/first-party-cookie (last accessed Apr. 29, 2024).

[28] PC MAG, *Third Party Cookie*, available https://www.pcmag.com/encyclopedia/term/third-party-cookie. (last accessed Apr. 29, 204).

44.     By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data for videos, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

45.     Meta confirms that it matches activity from LSAT Max to a user's profile.  Meta allows users to download their "off-site activity," which is a "summary of activity that businesses and organizations share with [Meta] about [the user's] interactions, such as visiting their apps or websites."[29]

46.     For example, Plaintiff Bennett's off-site report confirms that the Meta Tracking Pixel linked his LSAT Max activity to his Facebook account.



**Figure K**

---

[29] META, *Review your activity off Meta technologies* available
https://www.facebook.com/help/2207256696182627 (last accessed Apr. 29, 2024).

## CLASS ALLEGATIONS

47.    **Nationwide Class Definition:**  Plaintiffs seek to represent a class of similarly situated individuals defined as follows:

> All persons in the United States who have a Facebook account, have an LSAT Max subscription, and watched LSAT Max tutoring videos using the same browser they used to access their Facebook account.

48.    California Class Definition:  Plaintiffs seeks to represent a class of similarly situated individuals defined as:

> All persons in the State of California who have a Facebook account, have an LSAT Max subscription, and watched LSAT Max tutoring videos using the same browser they used to access their Facebook account.

49.    Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

50.    Excluded from the Classes are Defendant's past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case, their immediate families, Plaintiffs' counsel and Defendant's counsel.

51.    **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiffs do not know the exact number of members of the Classes.  However, given the popularity of Defendant's website, the number of persons in both Classes is believed to be so numerous that joinder of all members is impracticable.

52.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

(a)    Whether Defendant collected Plaintiffs' and the Classes' PII;

(b)    Whether Defendant unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;

(c)    Whether Defendant's disclosures were committed knowingly and intentionally;

(d)    Whether Defendant disclosed Plaintiffs' and the Classes' PII without consent; and

(e)    Whether Defendant's conduct violations California Civil Code § 1799.3.

53.    **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiffs' claims are typical of those of the Classes because Plaintiffs, like all members of the Classes, used LSAT Max to watch tutoring videos, and had their PII and PI collected, and video-identifying data disclosed by Defendant to a third party without their consent.

54.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):**  Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation.  Plaintiffs and their counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of the Classes.  Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interest of the absent members of the Classes.  Plaintiffs have raised variable statutory claims of the type reasonably expected to be raised by members of the Classes and will vigorously pursue those claims.  If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes (or to address additional Classes), additional claims as may be appropriate, or to amend the definition of the Classes to address steps that Defendant took.

55.    **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable.  Even if every member of the Classes could afford to pursue

individual litigation, the court system could not. It would be unduly burdensome to the court in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system, resulting in multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the Classes. Plaintiffs anticipate no difficulty in the management of this action as a class action.

**COUNT I**
**Violation of the Video Privacy Protection Act**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of the Classes)**

56.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

57.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendant.

58.    Defendant is a "video tape service provider" because it creates, hosts, and delivers thousands of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4). In particular, Defendant provides a library of audio visual material to consumers for a monthly fee, with the bulk of those videos being unavailable to non-consumers and consumers in lower subscriber tiers.

59.    Plaintiffs and members of the Classes are "consumers" because they have accounts with LSAT Max and pay a monthly fee to access and watch Defendant's videos. 18 U.S.C. § 2710(a)(1).

60.     Defendant disclosed to a third party, Facebook.com, Plaintiffs' and the members of the Classes' personally identifiable information.  Defendant installed the Facebook Tracking Pixel on its website to compel Plaintiffs' browsers to transfer their personally identifying information in the form of their Facebook ID, along with event data like a translatable title of the video they viewed, to Facebook.

61.     Plaintiffs and the members of the Classes viewed and accessed the videos using their LSAT Max accounts.

62.     Defendant knowingly disclosed Plaintiffs' PII because it installed the Facebook Tracking Pixel on its website and controlled its functionality.

63.     Plaintiffs and the members of the Classes did not provide Defendant with adequate consent—either written or otherwise—to disclose their PII and event data to third parties.

64.     Nor were Defendant's disclosures made in the "ordinary course of business" as the terms is defined by the VPPA.  Specifically, Defendant's disclosures to Meta were no necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

65.     On behalf of themselves and the members of the Classes, Plaintiffs seek: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of the Plaintiffs and the Classes by requiring Defendant comply with the VPPA's requirement for protecting a consumer's PII; (3) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (4) reasonable attorneys' fees and costs and other litigation expenses.

## COUNT II
### Violation of California's Civil Code § 1799.3
### (On Behalf of the California Subclass)

66.     Plaintiffs hereby incorporate the allegations contained in the foregoing paragraphs as if fully set forth herein.

67.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Subclass against Defendant.

68.     Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales … services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

69.     Defendant is a "person providing video recording sales … services" because it sells access to its online platform, LSAT Max, which creates, hosts, and delivers thousands of hours of video content on its website as part of its study plans.

70.     Defendant disclosed to Meta Plaintiffs' and the proposed Subclass Members' personal information.  Defendant utilized the Meta Tracking Pixel to compel Plaintiffs' browsers to transfer Plaintiffs' identifying information in the form of the Facebook ID, along with Plaintiffs' event data, like a translatable title of the videos they viewed.

71.     Plaintiffs and the Subclass Members viewed the videos using their LSAT Max accounts.

72.     Defendant knowingly disclosed Plaintiffs' personal information because it installed the Meta Tracking Pixel in the background of its webpages—which hosted the videos—and had control over its functionality.

73.     Plaintiffs and the Subclass Members did not provide Defendant with the necessary consent for Defendant to disclose their data to Meta.

74.     On behalf of themselves and the Subclass, Plaintiffs seek: (1) declaratory relief; (2) injunctive and equitable relief as necessary to protect the interest of Plaintiffs and the Subclasses by requiring Defendant to comply with Cal. Civ. Code § 1799.3's prohibition against disclosing a consumer's personal information; (3) statutory damages of $500 for each violation of this law pursuant to

Cal. Civ. Code § 1799.3(c); and (4) reasonable attorneys' fees and costs and other litigation expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgement against Defendants as follows:

(a)   For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as the representatives of the Nationwide Class and California Subclass, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(b)   For an order declaring that Defendant's conduct violations the statutes references herein;

(c)   For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)   An award of statutory damages to the extent available;

(e)   For punitive damages, as warranted, in an amount to be determined at trial;

(f)   For prejudgment interest on all amounts awarded;

(g)   For injunctive relief as pleaded or as the Count may deem proper;

(h)   For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  May 2, 2024                **BURSOR & FISHER, P.A**.

By:   */s/ Neal J. Deckant*
      Neal J. Deckant

Neal J. Deckant (State Bar No. 322946)
Stefan Bogdanovich (State Bar No. 324525)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
            sbogdanovich@bursor.com
            jwilner@bursor.com
            jglatt@bursor.com

*Attorneys for Plaintiffs*